UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Northbrook Digital
Corporation,

      Plaintiff,

v.                                 **MEMORANDUM OPINION**
                                      **AND ORDER**
                                    Civil No. 06-4206

Browster, Inc.,

      Defendant.

_____

      Peter M. Lancaster and Devan V. Padmanabhan, Dorsey & Whitney LLP for and on behalf of Plaintiff.

      William L. Roberts and Kevin P. Wagner, Faegre & Benson LLP for and on behalf of Defendant.

_____

      This matter is before the Court on Defendant Browster, Inc.'s ("Browster") motion for summary judgment, barring Plaintiff Northbrook Digital Corporation's ("Northbrook") from recovering damages due to its failure to meet the marking requirements of 35 U.S.C. § 287, and for a finding that Browster is not liable for willful infringement.

1

I.  Background

Browster is a defunct company that was created in early 2005 to develop and market enhanced Internet browsing software.  One of the features of the earlier versions of its software was "prefetching" of web content.  Prefetching is a process which involves delivering web page content to a computer's storage before the user specifically requests that the content of particular pages be made available.  It is Northbrook's position that prefetching is a feature that is covered by United States Patent Nos. 5,715,445; 5,946,682; 6,301,576; 6,604,103 and 7,103,594.  In its Complaint, Northbrook alleges that Browster willfully infringed these patents.

Browster claims that by the time this lawsuit was filed in October 2006, its Board of Directors recognized that it was not destined for profitability.  As a result, its assets were re-distributed to investors and product development was stopped.  The Browster website was shut down entirely by May 2007, but distribution of the software became non-functioning in February or March 2007.  Browster Ex. 8 (Milener Dep. p. 13-14).

II.  Procedural History

By Order dated February 13, 2008, this Court granted Northbrook's motion

for partial summary judgment, finding that certain claims of the patents at issue are not invalid and are infringed. Northbrook brought its motion for partial summary judgment in response to the fact that Browster did not file a claim chart, and generally did not participate in the discovery process.

   III.  Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. Celotex, 477 U.S. at 323. This burden can be met "by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Id. at 325. The party opposing summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

   IV.  Analysis

      A.  The Marking Requirements of § 287

To prevent unwitting infringement, the law requires patent owners who market a commercial embodiment of their invention to give notice to the public that such embodiment is patented "by fixing thereon the word 'patent' or the abbreviation 'pat.', together with the number of the patent." 35 U.S.C. § 287. If the patent owner fails to so mark its product, "no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for the infringement occurring after such notice." Id. The purpose of this statutory requirement is to help avoid innocent infringement by encouraging patentees to give notice to the public that an article is patented and to aid the public in determining whether an article is patented. Nike, Inc. v. Wal-Mart Stores, Inc., 138 F.3d 1437, 1443 (Fed. Cir. 1998).

It is Browster's position that Northbrook is not entitled to any damages in this case because it did not comply with § 287, nor did it give actual notice to Browster of possible infringement of its patents until this lawsuit was filed on October 18, 2006.

    1. Applicability of § 287

In May 2000, Northbrook entered into an exclusive licensing agreement

with Web3000 to resolve an infringement action brought by Northbrook with respect to the '445 and '682 patents. (Doc. No. 29, Wagner Decl., Ex. 10.) Under the terms of the licensing agreement, Web3000 was granted an exclusive license "to make, have made, use or sell, offer for sale, and import any product or service, which, if unlicensed would infringe one or more of the Patent Rights". (Doc. No. 29, Ex. 10, p. 3.) "Patent Rights" was defined in the agreement as "the Patents, the Applications, any and all future filed patent applications based on the same specification as the Patents or Applications and any patent that may issue from such applications" (Id. p. 1.) "Patents" is defined as the '445 and '682 patents, and "Applications" is defined as "pending U.S. Patent Applications Serial Nos. 09/379,969 and 09/477,121". (Id.) The '576 patent issued from the 09/477,121 application. (Doc. No. 1, Ex. 3.) The agreement also required Web3000 to make an initial payment of $150,000, and four additional yearly payments of $150,000 for a total of $750,000. (Doc. No. 29, Ex. 10, p. 2.) There is no marking requirements included in any of the terms of the licensing agreement. (Id., Ex. 10) In addition, there is no evidence in the record that Northbrook ever raised the issue of marking with Web3000, or evidence that Web3000 did mark its software. See Browster Ex. 4 and 5.

Northbrook argues that the marking defense does not apply in this case for a number of reasons.  First, Northbrook asserts that the licensing agreement with Web3000 was terminated in July 2001.  As the '576, '103 and '594 patents had not issued by that time, no third party was or could have been licensed under the patents and no product could have been marked with patent numbers that did not exist.

In support, Northbrook submitted two letters, dated July 20, 2001 and July 23, 2001, which address Web3000's default under the licensing agreement for nonpayment, and a notice of auction of the assets of Web3000.  Lancaster Decl., Ex. A.  Despite the alleged termination of the licensing agreement, there is evidence that Web3000's product that incorporates Northbrook's patents, Netsonic v3.00, remain available for download.  (Doc. No. 56, Exs. 4 and 5).

Browster asks that the Court not consider Northbrook's evidence concerning the alleged termination of the Web3000 licensing agreement, as Northbrook did not disclose such evidence pursuant to Browster's discovery requests.  Browster points to its Interrogatories Nos. 8 and 9.  No. 8 requested the following: "Please identify all communications with persons other than Browster offering to sell or license any or all of the patents at issue."  (Doc. No. 38, Ex. 4.)

No. 9 requested "Please identify all communications with persons other than Browster relating to infringement or alleged infringement of any or all of the patents at issue." (Id.)  Northbrook asserts that the July 2001 letters concerning Web3000's default and auction of assets are not responsive to either interrogatory request, and the Court agrees.  Accordingly, the Court will consider such evidence.

Browster further argues that the July 2001 letters nonetheless do not establish that the license agreement was properly terminated according to the terms of said agreement.  Paragraph 12 of the licensing agreement provides that Northbrook must first provide Web3000 notice of default.  The agreement further provides that if the default is not cured within 30 days, Northbrook must then provide written notice of termination.  (Doc. No. 29, Ex. 10.)  The evidence submitted by Northbrook only demonstrates that a notice of default was sent.  There is no evidence that Northbrook sent the required notice of termination after the period to cure default had passed.

The Court agrees that the evidence submitted by Northbrook does not definitively establish that the licensing agreement was properly terminated.  Yet, even assuming the licensing agreement was properly terminated, the Court

nonetheless finds that the marking requirements are applicable in this case, at least with respect to the patents and applications referenced in said agreement.

In so finding, the Court rejects Northbrook's argument that because the licensing agreement was terminated in July 2001, no licensed products could or should have been marked after that date. A similar argument was rejected by the court in <u>Alpex Computer Corp. v. Parker Bros.</u>, Civil No. 85-3969, 1988 WL 507622 (D. Mass. Aug. 12, 1988). In <u>Alpex</u>, the patentee had licensed its patent to a company that produced video game cartridges. The patentee had not required its licensee to mark its products for two years, and by the time the patentee took steps to ensure that the licensed products were marked, the licensee had stopped producing the game cartridges at issue. The patentee had argued that by the time the defendant began to allegedly infringe its patent, the patentee had become a "non-manufacturing patentee" and that the marking requirements no longer applied. The court rejected this argument as contrary to the purpose of the marking requirement, which is to "prevent unwilling infringement by a member of the public who, seeing an article bearing no mark indicating that it is patented, proceeds to make other specimens of it." <u>Id.</u>, at *2. The court went on to note that "[o]nce [the patentee] came under the "making or selling" rubric of § 287 by

allowing [the licensee] to manufacture the first cartridge, it made no difference whether there was one product or one million." Id.

In this case, Web3000 products were the commercial embodiment of the '445 and '682 patents, and should have been marked on the website through which the product could be downloaded. The fact that Web3000 auctioned its assets and dissolved does not change the fact that at one time, marking was required. The public, including those responsible for the development of the Browster software, would have had access to the Web3000 product and would not have been put on notice of Northbrook's patent rights during the term of the Web3000 licensing agreement. Accordingly, the fact that the licensing agreement terminated did not convert Northbrook to a "non-manufacturing patentee" to which the marking requirements did not apply.

Northbrook further asserts that where, as here, the patents at issue involve processes or methods, § 287 does not apply - as there is nothing tangible to mark. The law is clear that to the extent that there is something to mark, the marking requirements apply. Am. Med. Sys., Inc. v. Med. Eng'g Corp., 6 F.3d 1523, 1538 (Fed. Cir. 1993). Thus, if the patentee is asserting both apparatus and methods claims, the Federal Circuit has determined that "to the extent there is a tangible

9

item to mark by which notice of the asserted method claims can be given, a party is obliged to do so if it intends to avail itself of the constructive notice provisions of section 287(a)." Id. at 1538-39. In a case similar to this, the court held that a patent covering a method and system for trading mortgages in real-time that was utilized in a software application was subject to the marking requirement of § 287, as the website through which the software could be downloaded constituted "a tangible item to mark." IMX, Inc. v. Lendingtree, LLC, Civ. No. 03-1067, 2005 WL 3465555, at * 4 (D. Del. Dec. 14, 2005).

There is no dispute that Web3000 was accused of infringing the '445 and '682 patents through its NetSonic and NetSonic Pro products - which are downloads available from numerous websites. Similarly, Browster is accused of infringing the patents at issue through its browsing software that was available for downloading from various websites. Because the websites that offer the software can easily contain the requisite marking information, the Court finds § 287 applies here.

Based on the above, the Court finds that the marking requirements do not apply to the '576, '103 and '594 patents, as there is no evidence in the record that a commercial embodiment of these patents was ever marketed. The marking

defense does apply, however, to the '445 and '682 patents, as these patents were specifically referenced in the Web3000 licensing agreement.

      2.  Actual Notice

Even if the Court determines there was a failure to mark, Northbrook asserts that it properly put Browster on notice of its patents, and of possible infringement through the letters and phone calls made from May 2005 through October 2006.  Although the letters do not use the word "infringement", the Court can still find that the letters nonetheless conveyed Northbrook's infringement concerns.  See Hoover Co. v. Bissell, Inc., 38 F. Supp.2d 519, 523-24 (N.D. Ohio 1999); Konstant Prods. Inc. v. Frazier Indus. Co., Inc., 25 U.S.P.Q.2d 1223 (N.D. Ill. 1992).

Browster responds that it was not put on actual notice of any possible infringement issues until this lawsuit was filed.  The first letter received from Northbrook, dated May 25, 2005, stated the following:

> Enclosed please find a copy of U.S. Patent No. 5,715,445, U.S. Patent No. 5,946,682, U.S. Patent No. 6,301,576, and U.S. Patent No. 6,604,103.  All of these patents disclose subject matter relating to prefetching.
>
> These patents, as well as a number of pending patent applications based on the same subject matter, are currently not licensed, and are available for license on an exclusive or nonexclusive basis.  We may also consider the

> outright sale of these patent rights and the pending applications.
>
> If Browster, Inc. has an interest in obtaining an exclusive or nonexclusive license, or in acquiring the patent rights, I would be pleased to discuss the matter with you.

Wagner Decl., Ex. 17.  The next written communication was an email dated July 26, 2005 from Mark Wolfe to Scott Milener at Browster, which reiterates what was said in the May 25, 2005 letter, with the addition that "I haven't yet had a chance to carefully evaluate Browster's product myself, but I hope to do so in the near future."  Wagner Decl., Ex. 9.  The next piece of correspondence is another email dated August 17, 2005, in which Wolfe states "As I mentioned yesterday, we still have not examined the situation carefully enough to determine whether the patents even apply to what Browster is doing.  But if you have any questions or comments, please feel free to call."  Wagner Decl., Ex. 10.  Browster asserts that nothing in these communications put it on notice of possible infringement.  The Court agrees.

> For purposes of section 287(a), notice must be of "the infringement," not merely notice of the patent's existence or ownership.  Actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device.

Amsted Indus. Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 187 (Fed. Cir.

1994).  It is not necessary that the word "infringement" is used.  "Given the right context, the words 'contained in' or similar words could be read synonymously with 'infringement,' and thus could be sufficient to put the defendant on notice that the patentee is charging infringement, which is all that the statute requires."  Hoover, 38 F. Supp.2d at 524 (citations omitted).

Neither the May 2005 letter or the July and August 2005 emails contain language that would put Browster on notice of possible infringement claims.  In fact, the July and August 2005 emails clearly inform Browster that Northbrook had not done an infringement analysis of any kind.  Nor do any of these communications identify any specific Browster product that allegedly infringes the patents.

Northbrook argues that Wolfe told Milener, in a telephone conversation on October 7, 2005, that Browster should be taking a license under Northbrook's patents.  What Wolfe actually stated in his declaration, however, was that he "expressed his frustration that after all of my correspondence and calls to him, Browster had still not yet provided any substantive response to my communications about the patents."  Wolfe Decl. ¶ 7.  He further stated that "In my own view, Browster should be taking a license under the patents held by

13

Northbrook, and that I had started to involve lawyers to look into Browster's infringement." Id. The notes that Wolfe referenced during this October 2005 telephone call indicates that Wolfe had not received an opinion as to whether Browster's product infringed the patents at issue at that time. Browster Ex. 11. Although Wolfe's declaration appears to contradict his notes, the Court nonetheless finds no issue of fact is created because nothing in the declaration demonstrates that Browster was given actual notice of infringement. Wolfe admits that he told Milener that he hadn't yet received an opinion on infringement, and there is no affirmative statement in the declaration that Browster's software infringes.

The Court does find, however, a genuine issue as to the date upon which Browster did receive notice of possible infringement issues. By this motion, Browster asserts that it did not receive notice as of the date this lawsuit was filed in October 2006. In an email dated April 21, 2006, however, Milener informed Wolfe that

> We have reviewed the patents that you brought to our attention. While the patents relate to specific methods of prefetching, and we use the word 'prefetching' in our marketing to communicate a benefit to consumers, our products utilize other methods of retrieving web pages. Thus, we do not desire to license the patents. However, if the price is reasonable, we may

>be interested in acquiring the patents in order to build up a defensive
>patent portfolio.

Lancaster Decl., Ex. C at N000010.  Also, Milener admitted in his deposition that by June 2006 "we had then seen these patents, and Mark was being more assertive about us dealing with it, and that was probably in my mind at the time, to try to drive the company to release a version without prefetching."  Browster Ex. 8, (Milener Dep. at p. 223.)  The record thus demonstrates that Browster, at least by April 2006, was on notice of possible infringement of the patents at issue.

Accordingly, the Court will grant Browster's motion to the extent that Northbrook is precluded from recovering damages that incurred prior to April 2006 with respect to the '445 and '682 patents.

### B.  Willful Infringement

"Because patent infringement is a strict liability offense, the nature of the offense is relevant only to the issue of enhanced damages."  <u>In re Seagate Technology, LLC</u>, 497 F.3d 1360, 1368 (Fed. Cir. 2007).  An award of enhanced damages requires a showing of willful infringement.  <u>Id.</u>  To prove willful infringement, there must be a showing of objective recklessness.  <u>Id.</u> at 1371.  Recklessness is defined as acting "in the face of an unjustifiably high risk of harm

15

that is either known or so obvious that it should be known." Id.  To establish willful infringement, it is necessary to "show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." Id.

Browster argues that under this standard, it is entitled to summary judgment on the issue of willful infringement.  Browster asserts the fact that it independently developed its software, that it was not given actual notice of Northbrook's claims of infringement until this lawsuit was filed, together with the existence of legitimate non-infringement defenses demonstrates that its pre-litigation conduct was objectively reasonable.

Northbrook asserts that summary judgment on willful infringement must be denied, as there is sufficient evidence demonstrating that Browster's decision to continue to distribute its software despite its knowledge of the patents at issue was objectively reckless.  Northbrook again asserts that Browster had actual knowledge of infringement as early as May 2005, and that Scott Milener admitted that he did not even look at the patents at issue until June 2006.  Within two months of studying the patents, Browster then began distributing a modified, but nonetheless infringing, version of its software.  Northbrook also asserts that

Milener withheld information about the alleged infringement from outside investors, and that Browster thereafter distributed its assets to investors without first investigating infringement issues.

As discussed previously, the record demonstrates that Browster had notice of possible infringement issues by at least April 2006 - not May 25, 2005 as asserted by Northbrook.  Such a finding clearly weighs against a finding of willful infringement.  The fact that Browster also took steps to reduce or eliminate any damages by removing the "prefetching" feature from its product also weighs against a finding of recklessness.  Further, after this suit was filed, Browster allowed its distribution website to become non-functional.  Wagner Decl., Ex. 8 (Milener Dep. 218-219; 222.)  Contrary to Northbrook's assertions, these actions demonstrate Browster's good faith intent to militate against a finding of willfulness.

Finally, Northbrook asserts that by distributing its assets to investors, Browster acted recklessly by not ensuring assets were available for its possible damages under a patent infringement lawsuit.  The Court disagrees.  Browster has submitted evidence indicating that the decision to shut down Browster was a business decision, based on the determination that Browster was not functioning

as envisioned.  Browster Ex. 8 (Milener Dep. p. 224) ("it was clear to me that prefetching, no prefetching, the Browster product was not going to fly.  People weren't using it in the critical mass as we needed, they were uninstalling it at high rates, it was stressing out people's machines.  Browster was making extremely small amounts of revenue, as we've shown you . . .").  To corroborate Milener's comments, Browster has submitted evidence demonstrating that Browster was not generating revenue.  Browster Ex. 12 (Profit and Loss - January through December 2006 - showing total revenue of $400.60).  Further, Browster did not distribute assets to investors until after this lawsuit was filed, and after Browster made the determination that its browsing software was not successful.  Lancaster Decl., Ex. B. (Milener Dep. p. 111).

Based on this record, and viewing the facts in the light most favorable to Northbrook, there are no facts upon which a reasonable jury could find, by clear and convincing evidence, that Browster's conduct was objectively reckless.  Accordingly, summary judgment of no willful infringement will be granted.

IT IS HEREBY ORDERED that Browster, Inc.s' Motion for Summary Judgment [Doc. No. 52] is GRANTED in part and DENIED in part as follows: Northbrook is barred from recovering any damages as a result of Browster's

alleged infringement of U.S. Patent Nos. 5,715,445 and 5,946,682 prior to April 2006; and Browster did not willfully infringe U.S. Patent Nos. 5,715,445; 5,946,682; 6,301,576; 6,604,103; and 7,103,594.

Date:  August 26, 2008

                                        <u>s/Michael J. Davis</u>
                                        Michael J. Davis
                                        Chief Judge
                                        United States District Court